UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

STEVEN CURTIS FRANKLIN )
 )
V. ) NO. 2:11-CV-150
 )
MICHAEL J. ASTRUE, )
Commissioner of Social Security )

REPORT AND RECOMMENDATION

The matter is before the United States Magistrate Judge, under the standing orders of the Court and 28 U.S.C. § 636 for a report and recommendation, following the administrative denial of the plaintiff's application for Disability Insurance Benefits, under the Social Security Act. The denial came following two administrative hearings before an Administrative Law Judge ["ALJ"]. Both the plaintiff and the defendant Commissioner have filed dispositive Motions [Docs. 9 and 11].

The sole function of this Court in making this review is to determine whether the findings of the Secretary are supported by substantial evidence in the record. *McCormick v. Secretary of Health & Human Services*, 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Comm.*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Secretary's decision

must stand if supported by substantial evidence. *Listenbee v. Secretary of Health and Human Services*, 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

Plaintiff was 32 years of age at the time of his insured status expired on March 31, 2009. He has a limited education. He cannot perform any of his past relevant work, and that fact is not in dispute.

Plaintiff does not appeal the ALJ's finding that he has no severe mental impairment. Therefore, the issue here relates solely to his physical impairments. Plaintiff has various severe impairments relating to a serious motorcycle accident in 2003, which are right left femoral fracture; left knee internal derangement; status post arthroscopy; and disunion of the right femur. (Tr. 18). The plaintiff's medical history as to his physical complaints is summarized by the plaintiff in his brief as follows:

> Plaintiff underwent knee x-rays on September 27, 2007, due to bilateral knee pain. The right knee x-rays showed a distal femoral IM rod in place with fracture line still visible in the distal femoral shaft. The left knee showed corticated bone densities posterolateral to the distal left femur and proximal left tibia, possibly representing loose bodies within the joint (Tr. 210-213).
> Plaintiff has received Emergency Room treatment at Hawkins County Memorial Hospital. On October 9, 2007, treatment was rendered for a forehead laceration (Tr. 238-254). Plaintiff was seen on three occasions from March 28, 2008 through April 28, 2008, due to chronic left knee pain (Tr. 214-237).
> Plaintiff underwent MRI of the left knee on April 1, 2008 and the MRI was compared with a previous one dated May 27, 2003. The impression noted the cruciate and medial collateral ligament tears have more or less healed; lateral collateral ligaments are very difficult to delineate, but what appeared to be avulsion of the tip of the fibula on the previous exam has not fused with the proximal fibula or at least there is still a bony fragment seen proximal to the proximal fibula; this fragment is between the popliteus tendon and the biceps tendon and looks like it is displacing the biceps tendon laterally and even the popliteus tendon medially; and there is still some subluxation of

2

the lateral femoral condyle from the tibia (Tr. 259-260).

On April 16, 2008, Plaintiff presented to Appalachian Orthopaedic Associates with a chief complaint of left leg pain. Exam of the left knee revealed laxity with varus stress, as well as laxity with anterior and posterior drawer. MRI was reviewed and the assessment was left knee pain and derangement (Tr. 257-258). Plaintiff returned on April 22, 2008, at which time he described diffuse knee pain and diffuse leg pain. On exam, Plaintiff had a very positive anterior drawer with a very soft endpoint, as well as posterolateral instability and valgus instability. Review of MRI was noted to confirm an ACL rupture and LCL rupture with avulsed piece of bone and what appears to be a posterolateral corner injury. The impression was ACL, LCL, and posterolateral corner injury. Dr. Miller noted he would like to refer Plaintiff for a multiple ligament reconstruction, as there is fairly significant ligamentous disruption to his left knee, but he has no insurance (Tr. 256). On May 6, 2008, Plaintiff returned with left ankle pain which was not felt to be related to the knee pain (Tr. 255).

Plaintiff received treatment at Rural Health Services Consortium from September 13, 2007 through May 9, 2008, due to right knee pain, gastroesophageal reflux disease [hereinafter "GERD"], and chronic left knee pain (Tr. 261-278). On September 13, 2007, right knee x-rays showed evidence of an intramedullary rod through the shaft of the femur where there was noted an apparent healed old fracture (Tr. 276).

Plaintiff received Emergency Room treatment at Holston Valley Medical Center on March 30, 2008, due to left leg and knee pain (Tr. 279-285). Plaintiff received treatment at Centerpointe Medical Clinic from June 23, 2008 through July 21, 2008, due to bilateral knee pain, decreased right knee range of motion, dyspepsia, and GERD (Tr. 297-298).

On June 10, 2008, a reviewing state agency physician opined Plaintiff can lift/carry a maximum of 50 pounds occasionally, 25 pounds frequently; can stand/walk for a total of about six hours in an eight-hour workday; and can sit for a total of about six hours in an eight-hour workday (Tr. 289-296). On September 18, 2008, a reviewing state agency physician opined Plaintiff can lift/carry a maximum of 50 pounds occasionally, 25 pounds frequently; can stand/walk for a total of about six hours in an eight-hour workday; can sit for a total of about six hours in an eight-hour workday; and can only occasionally climb ladders, ropes, and scaffolds (Tr. 299-306).

Plaintiff was seen at Wellmont Hawkins Orthopedics on April 30, 2008, due to severe left knee pain associated with stiffness, difficulty walking, instability of the knee, and disrupted sleep. Exam was remarkable for moderate swelling in the knee, generalized tenderness with a moderate effusion, positive anterior drawer and lachman's testing, definite lateral laxity, and positive posterior drawer test. Knee MRI was reviewed and noted to show LCL tear as well as findings suggestive of both ACL and PCL tears. The impression was ACL, LCL, and possibly PCL tears, left knee, symptomatic. Plaintiff was to be referred to Dr. Hovis (Tr. 368-371).

Plaintiff continued treatment at Centerpointe Medical Clinic from October 21, 2008 through July 19, 2009, during which time he was suffering bilateral knee pain with decreased range of motion of both knees, anxiety, dyspepsia, GERD, right hand numbness, bilateral leg pain, and weight loss (Tr. 372-376, 401-405). On July 10, 2009, FNP Bellamy reported Plaintiff has dealt with chronic knee pain over the years which has progressively worsened leading to the need for multiple surgeries; his most recent

3

injuries included lateral collateral posterolateral corner tear, partial anterior cruciate ligament tear, partial posterior cruciate ligament tear, and intraarticular scar tissue; and he also has a history of extensive injuries to the right leg including rod placed from hip to femur with bone graft placed. FNP Bellamy noted that, due to these conditions, Plaintiff continues to have trouble with weight bearing and ambulation for extended periods of time (Tr. 377-379).

Dr. Kurt P. Spindler, of Vanderbilt University Medical Center, treated Plaintiff from June 10, 2008 through September 11, 2008. Plaintiff first presented with left knee pain and instability. Dr. Spindler recommended arthroscopy. On July 23, 2008, Plaintiff underwent left knee arthroscopy debridement, LCL and PCL ligament reconstruction, and repair of LCL evulsion bone to fibula. During follow-up, Plaintiff did relatively well (Tr. 380-389).

Plaintiff underwent consultative exam by Dr. Robert A. Blaine on September 14, 2009. Presenting problems included rod in femur, rebuilt left knee, left knee pain, inability to bend or squat, difficulty going down hills and steps, and disunion of the femur. Exam was remarkable for decreased internal rotation of the shoulders, decreased right hip flexion, decreased right knee range of motion, lower extremity pain with straight leg raise, absent deep tendon reflexes, ataxia, inability to heel walk, and inability to squat all the way. Right femur x-rays showed an intramedullary rod within the right femur, chronic changes at the mid-diaphyseal fracture site, and a prominent fracture line still visualized. The impression noted findings at the fracture site are suggestive of non-union. The diagnoses were status post motor vehicle accident with right femoral fracture with a rod still in place, left knee internal derangement status post surgery, and disunion of the right femur.

In the body of his report, Dr. Blaine opined Plaintiff can stand or walk for a total of three to four hours in an eight-hour day and could lift and carry up to 20 pounds on a frequent basis and possibly 45 to 50 pounds on an infrequent basis. In the attached assessment form, Dr. Blaine opined Plaintiff can never lift/carry 51 pounds or more; can occasionally carry 21-50 pounds; can frequently lift 21-50 pounds and carry 11-20 pounds; can sit for a total of eight hours in an eight-hour workday, four hours without interruption; can stand for a total of four hours in an eight-hour workday, one hour without interruption; can walk for a total of three hours in an eight-hour workday, 30 minutes without interruption; can occasionally operate foot controls bilaterally; can never climb, crouch, or crawl; can occasionally balance, stoop, and kneel; and can never be exposed to unprotected heights (Tr. 390-400).

[Doc. 10, pgs. 2-7].

As a result of the first administrative hearing on July 22, 2009 (Tr. 50-56), the ALJ, on plaintiff's motion, decided to send the plaintiff for the consultative medical examination conducted by Dr. Blaine referenced above. The second hearing was held on November 13, 2009. Plaintiff testified basically to pain which prevents him from doing any inside or

4

outside activities during the entire day except for "laying around on the couch all the time" and watching television. (Tr. 37-38). When asked by his attorney about difficulty with walking and standing, plaintiff testified that "I've had a little trouble getting started walking when I get up to walk." When asked about climbing steps, he stated "it takes a minute to get up them" and that he usually has "to use my left leg to get up the step–one step at a time." (Tr. 38). He said he has "a cane I carry around in the truck with me." (Tr. 39).

The ALJ then took the testimony of Donna Bardsley, a vocational expert ["VE"]. After asking her to classify his past relevant work, the ALJ asked her to assume a person of plaintiff's age, education and past work experience who had "all the restrictions set out by Dr. Blaine" in the report based upon his consultative examination. When asked if there were jobs the plaintiff could perform with Dr. Blaine's suggested limitations, she identified jobs as hand packagers, sorters, assemblers, inspectors, cashiers and information clerks. She stated there were 8,000 such jobs in the region and 7 million in the nation. (Tr. 42). He then asked her what the number of jobs would be with a sit/stand option. She stated that she assumed that from Dr. Blaine's restrictions and that all of the identified jobs allowed a sit/stand option. He then asked to assume the same hypothetical, except at the sedentary exertional level. She stated there would be 3,000 such jobs in the region and 4 million in the nation. (Tr. 43-44).

In his hearing decision, the ALJ found the above mentioned severe impairments relating to his knees and legs. He carefully discussed the findings of Dr. Spindler who did the arthroscopic surgery on his left knee at Vanderbilt described above. (Tr. 18). After an analysis of the lack of evidence of a severe mental impairment which is not at issue in this

5

Case 2:11-cv-00150-JRG-DHI   Document 13   Filed 01/25/12   Page 5 of 9   PageID #: 70

judicial review, he found that the plaintiff did not meet or medically equal any listed impairment in 20 CFR Part 404, Subpart P, Appendix 1. He stated that "no treating or examining physician has suggested the presence of any impairment or combination of impairments of listing level severity. The undersigned has considered listings relative to musculoskeletal listings and he does not find the presence of any criteria set forth in said listings to warrant a finding that the claimant meets or equals any listing." (Tr. 19-20).

The ALJ then stated his finding regarding the plaintiff's residual functional capacity ["RFC"]. He found that the plaintiff could perform a limited range of light work, and that "due to the claimant's knee injury, he is able to lift no more than 20 pounds at a time with frequent...lifting or carrying objects weighing up to 10 pounds. Additionally, he has the ability to engage in a good deal of walking or standing. He has the ability to sit most of the time with some pushing and pulling of arm and leg controls. Further, he has the ability to stoop occasionally.... Finally, due to the claimant's knee injury, he must periodically alternate sitting and standing to relieve pain and discomfort." (Tr. 20).

He then discussed the plaintiff's testimony. He found the plaintiff was not credible to the extent his reported symptoms were inconsistent with the RFC finding. He discussed various factors used in arriving at this conclusion, such as being observed exiting the driver side of the vehicle in which he drove to the consultative examination and then telling the examiner he did not drive there. He denied the use of alcohol or drugs to the examiner, but then admitted to drinking two to three beers once a month. He also admitted to being arrested for possession of marijuana, having been found with 78 pounds of marijuana which plaintiff claimed to have found in a field.

6

The ALJ then thoroughly discussed Dr. Blaine's examination of the plaintiff and his objective observations, including antalgic gait and "fairly normal" tandem walking and toe walking and a normal ability to stand on a single leg. (Tr. 21). He also discussed then findings and comments of the various treating doctors, and the opinion of Nurse Practitioner Tanyelle Bellamy. (Tr. 22-24). He gave her opinion little weight because no treating physician had suggested plaintiff was disabled or could not engage in substantial gainful activity. He gave Dr. Blaine's opinion great weight. (Tr. 24). Based upon evidence which emerged after State Agency review, primarily the examination by Dr. Blaine, he found plaintiff more restricted than the State Agency reviewing physicians. (Tr. 25). He gave Dr. Spinder's opinion great weight, noting that Dr. Spindler's comment before he performed surgery that plaintiff was unable to work because of his knee injury, this was not repeated by Dr. Spindler after the surgery. (Tr. 25).

The ALJ, based upon Ms. Bardsley's testimony, found that there were a substantial number of jobs which the plaintiff could perform. (Tr. 26). Accordingly, he found that he was not disabled. (Tr. 27).

Plaintiff asserts that the ALJ erred in not finding that he meets the requirements of Listing 1.06 set forth in 20 CFR Part 404, Subpart P, Appendix 1. Also, plaintiff alleges that the ALJ did not discuss the reason for his finding that the plaintiff did not meet this listing adequately for the Court to conduct a meaningful review of the basis for so finding.

Listing 1.06, requires a "fracture of the femur...with (A.) Solid union not evident on appropriately medically acceptable imaging and not clinically solid; and (B.) Inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur

7

or is not expected to occur within 12 months of onset." 1.00B2b(1) says "ineffective ambulation is defined generally as having insufficient lower extremity functioning...to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." 1.00B2b(2) says "examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes..." This is a rather precisely worded requirement, with a strong emphasis on the fact that the person who seeks to prove he or she cannot effectively ambulate must either have to use assistive devices which restrict the use of both hands, or be unable to walk any distance in a reasonable amount of time without the use of such devices.

While there is no dispute that the plaintiff does not have "solid union" of the fracture of his right femur, to meet the listing, the plaintiff is also subject to 1.06B and is required to prove that he cannot "effectively ambulate" as defined and described above, and that this inability continued for 12 months or more.

The plaintiff himself testified that he could walk, although he has "a little trouble getting started" and could climb steps one at a time. He testified he carried a cane around with him in his truck. He did not use it when he visited Dr. Blaine, but reported using it "on a p.r.n. basis. He said he had done so "since he came off crutches." (Tr. 392). There is no evidence that he was on crutches for 12 months at any time in the record, and he has not said he was. Even without his cane, Dr. Blaine opined that he could stand and walk for three to four hours in an eight hour workday. This does not describe an individual who meets the definition of an inability to "effectively ambulate."

The lack of evidence in the record from which it could have even arguably been found
8

that plaintiff met Listing 1.06 renders the argument that the ALJ erred in not explaining his reasoning more fully inconsequential. If there were such evidence then an argument to remand for his explanation would be much more compelling. But the proof simply does not exist.

The ALJ had substantial evidence for his RFC finding in the opinion of Dr. Blaine and other medical evidence. There was thus substantial evidence to support the question to the VE. The ALJ did not err either in failing to find the plaintiff met Listing 1.06, or in not elaborating on why he did not so find. His finding that the plaintiff was not disabled was thus supported by substantial evidence and should stand.

Accordingly, it is respectfully recommended that the plaintiff's Motion for Summary Judgment [Doc. 9] be DENIED, and the defendant Commissioner's Motion for Summary Judgment [Doc. 11] be GRANTED.[1]

                                              Respectfully submitted:

                                              s/ Dennis H. Inman
                                              United States Magistrate Judge

---

[1] Any objections to this report and recommendation must be filed within fourteen (l4) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).